LEWIS *v.* FORREST CITY SPECIAL IMPROVEMENT DISTRICT.

Opinion delivered January 8, 1923.

1. MUNICIPAL CORPORATIONS—IMPROVEMENT DISTRICT.—Special Acts 1921, p. 1358, providing for the formation of a special improvement district to take over the property of three previously organized improvement districts in a city, is not invalid on the ground that the Legislature cannot authorize the creation of a local improvement district with power to pay the debts incurred by the city in the operation of the improvements constructed by the old districts; nor on the further ground that such indebtedness includes interest on the city's obligations, which is forbidden by law, since the act contemplates that only legal obligations of the city shall be paid.

2. MUNICIPAL CORPORATIONS—ORDINANCE—FAILURE OF MAYOR TO SIGN RECORD.—Failure of the mayor to authenticate a duly passed and recorded ordinance, as provided by Crawford & Moses' Dig., § 7499, does not defeat the ordinance; the statute merely providing for the method of making a record.

3. MUNICIPAL CORPORATIONS—PROOF OF ORDINANCE.—Introduction of a certified transcript from a city clerk's record, showing the passage of a certain ordinance, *held* sufficient to establish the legal enactment of the ordinance, though the record was signed by the mayor after his term of office expired.

4. MUNICIPAL CORPORATIONS—ORDINANCE—PAROL ATTACK.—Where the record of city ordinances kept by the city clerk, together with the journals showing the progress of the ordinances through the council, show a valid ordinance, they cannot be attacked by parol evidence.

5. MUNICIPAL CORPORATIONS—ORDINANCE—RECORD.—The record of a municipal ordinance was not invalid because, instead of actually transcribing it on the record, the pages containing the copy were pasted into the record.

6. MUNICIPAL CORPORATIONS—ORDINANCE—DISQUALIFICATION OF MEMBERS OF COUNCIL.—The fact that some of the members of a city council had signed a petition for the formation of a local improvement district did not disqualify them to join in the action of the council in passing the ordinance creating the district; as the members acted in a legislative capacity, and personal interest did not disqualify them.

7. MUNICIPAL CORPORATIONS—LOCAL IMPROVEMENT—PETITIONS.—Where a special act providing for the creation of a municipal improvement district in accordance with the general statute contained a special limitation of indebtedness, it was not nec-

sary that the petitions for the improvement required by the general statute should express the limitation of indebtedness provided by the special act, as the petitions carry with them the limitation expressed in the special act.

8. MUNICIPAL CORPORATIONS—VARIANCE BETWEEN PETITIONS.— Where the first petition for the formation of a local improvement district did not express the statutory limitation of expenditures, the fact that the second petition stated the maximum total cost did not constitute a variance from the first petition nor invalidate the proceedings for the formation of the district.

9. MUNICIPAL CORPORATIONS—UNAUTHORIZED SIGNATURE OF CORPORATION.—Where a petition for a special local improvement district was signed in the name of the corporation by its president and manager, without express authority from the board of directors, the board of directors could not, after enactment of the ordinance pursuant to the petition, validate the signature by ratification, since there must be a majority in value of the property represented by authorized signatures before the council could pass the ordinance.

10. MUNICIPAL CORPORATIONS—SIGNATURE OF CORPORATION—AUTHORITY.—Where the president, manager and principal stockholders of a corporation signed the name of the corporation to a petition for a special local improvement district without express authority from the directors, the corporation was bound where such officer had the exclusive management of the affairs of the corporation, and was permitted to exercise full authority to do anything which in his judgment called for action for its benefit, in effect amounting to a holding out of such officer as the corporation itself.

11. MUNICIPAL CORPORATIONS—PETITION FOR IMPROVEMENT—PRESUMPTION AS TO SIGNATURE.—The appearance of a signature on a petition for a local improvement district raises a presumption that it was placed there by authority.

12. MUNICIPAL CORPORATIONS—LOCAL IMPROVEMENT—PRESUMPTION OF BENEFIT.—There is a presumption that a proposed local improvement to be made through the organization of a local improvement district under the terms of a special statute would result in a benefit to all of the real property in the district.

Appeal from St. Francis Chancery Court; *A. L. Hutchins,* Chancellor; affirmed.

*Walter Gorman,* for appellant.

The ordinance laying off the district was not legally passed. 80 Ark. 108; 28 Cyc. 355; 71 Atl. 211; 10 Atl.

162; 80 N. W. 564; 50 N. W. 316; 71 N. W. 189; 54 N. E. 1081; 90 N. E. 583; 25 N. J. Law 399; 19 R. C. L. 892. The signing of the ordinance by the mayor, after his term of office expired, was of no effect.   93 N. W. 510. Courts will not take judicial notice of ordinances.   68 Ark. 483; 108 Ark. 24.   The ordinance was never recorded as provided by law.   C. & M. Digest, § 7499; 3 Pa. Co. Ct. Rep. 480.   It is improper and illegal for a member of a municipal council to vote upon any question in which he is personally interested.   19 R. C. L. 897; 67 Atl. 564; 44 L. R. A. 728; Cooley's Constitutional Limitations (7th ed.) 392.

*Mann & Mann,* for appellee.

A mere delay in the mayor affixing his signature to an ordinance will not defeat the express wishes of the taxpayers. His signature is merely a ministerial act as a means of authenticating the record.   C. & M. Digest, § 7499; 28 Cyc. 357; 19 R. C. L. 892.   The presumption is that the signing of the petition by the officers of the corporations was authorized.   144 Ark. 249; 79 Ark. 338; 89 Ark. 435; 116 Ark. 520; 103 Ark. 283.

McCulloch, C. J.   It appears that there have been organized in the city of Forrest City three local improvement districts under general statutes (Crawford & Moses' Digest, § 5647 *et seq.*), designated, respectively, as Forrest City Improvement District No. 1, Improvement District No. 2 of Forrest City, and Improvement District No. 3 of Forrest City, for the purpose of constructing a waterworks plant, an electric light plant, and a sewer system within the territory of the respective districts, and, after the completion of the improvements, they were taken over, for operation, by the city council.   The city has incurred in the operation of said districts an unpaid indebtedness of $51,013.76.

The General Assembly of 1921 enacted a statute authorizing the organization, under general statutes, *supra,* of the real property in the city of Forrest City, or in any part which includes the whole of the territory em-

braced within the three districts heretofore referred to, into an improvement district to be known as "The Forrest City Special Improvement District," and with authority to "take over and be the owner of all the real and personal property and property rights and choses in action now belonging to Forrest City Improvement District No. 1, Improvement District No. 2 of Forrest City, and Improvement District No. 3 of Forrest City, and shall assume all debts and obligations of said districts, and shall have power to repair, enlarge, overhaul, erect and in every manner equip the present plants belonging to said three improvement districts heretofore existing,. or to purchase and install new machinery and power plants, erect any suitable buildings, to purchase real or personal property, to sell or trade any real or personal property now owned by either of said districts or hereafter acquired by it, to enlarge and extend water, sewer and light facilities, lay additional water-pipes or erect additional electric lines, or lay additional sewers, as needed."

Another section provides that the new district "shall assume and discharge all liabilities incurred by the city of Forrest City in the operation of any of said plants, and in the improvement thereof." The statute provides that the district shall be organized pursuant to the general statutes and be controlled by said statutes, except as otherwise specifically provided in the new statute.

The statute contains a recital that "it has been found advantageous to consolidate the operations of said districts, treating them as a single district for the purpose of economy and efficiency in their operation," and that, on account of the growth of the city, "there is much territory requiring water, electric light and sewers which is not served by said districts, and the water, electric light and sewer plants need large repairs, reconstruction and great extensions in order to serve the people of said city." Special Acts, 1921, p. 1358.

Pursuant to the terms of this statute, Forrest City Special Improvmeent District was created by ordinance

upon the petition of ten owners of real property, in accordance with the general statutes, *supra.* The second petition asking for the improvement, and purporting to be signed by a majority in value of the owners of real property in the proposed district, was filed with the city council, and, after notice, it was found to contain a majority, and an ordinance was enacted authorizing the construction of the improvement and imposing the cost on the real property in the district.

The two appellants, who are owners of real property in the district, instituted this suit in the St. Francis Chancery Court to restrain further proceedings under the ordinances, and they attack the validity of the statute itself, also the validity of the ordinances of the city, as well as raising the question of the majority in value of the property owners having signed the second petition.

On the hearing of the cause on testimony adduced by each side, the chancery court dismissed the complaint for want of equity, and an appeal has been prosecuted.

An attack is made on the validity of the statute on the sole ground that the Legislature could not authorize the creation of a local improvement district with power to pay the debts incurred by the city in the operation of the improvements constructed by the old districts, especially where the indebtedness of the city included interest on notes or other written obligation.

As to the question of authority to pay interest, it can be said that no such authority is expressly conferred in the statute. The statute merely provides that the new district, when organized, "shall assume and discharge all liabilities incurred by the city of Forrest City in the operation of any of said plants, and in the improvement thereof." This language refers, of course, to valid and enforceable obligations of the city, and the new district is not bound to pay any other asserted liability. We cannot adjudicate in advance what will be treated as valid obligations, as the district has never got far enough along to actually undertake to assume or pay the obliga-

tions of the city. Owners of property would, of course, be entitled to be heard in court to restrain any unauthorized act of the commissioners in attempting to pay an illegal obligation of the city.

This statute was passed for the purpose of enabling the new district formed under its terms to take over the affairs of the three former districts and to assume their obligations, and, as a part of the adjustment of equities in taking over the property of the old districts, the new one is required to assume the indebtedness incurred by the city in operating these districts while under its control. There is no legal objection to the inclusion of these things in the taking over of the old districts by the new one, since it is necessary to operating under the new district that the assent of a majority in value of the owners of property in the district be obtained. The attack upon the validity of the statute is therefore unfounded.

It is next contended that the second ordinance of the city council authorizing the construction of the improvement and imposing the cost on the real property in the district is void because it was not properly recorded and authenticated by the signature of the mayor, as provided by statute.

Counsel for appellants relies on the statute, which reads as follows:

"All by-laws or ordinances shall, as soon as may be after their passage, be recorded in a book kept for that purpose, and be authenticated by the signature of the presiding officer of the council and the clerk; and all by-laws or ordinances of a general or permanent nature, and of those imposing any fine, penalty or forfeiture, shall be published in some newspaper of general circulation in the corporation. Provided, in incorporated towns where no newspaper is published, written or printed notices posted up in five of the most public places in said corporation shall be deemed a sufficient publication of any law or ordinance for incorporated towns; and it shall be

deemed a sufficient defense to any suit or prosecution for such fine, penalty or forfeiture to show that no such publication was made.'' Crawford & Moses' Digest, § 7499.

The city clerk was introduced as a witness, and produced a certified transcript of the ordinance, purporting to have been taken from the record, and also produced the record itself. The ordinance in question appeared on a typewritten page or pages pasted into the record kept for the purpose of recording ordinances, and this was signed by the mayor and city clerk, that is, by Mr. Grobmyer, the person who was mayor at the time the ordinance was passed. It was shown by oral testimony that Mr. Grobmyer's term of office expired within a day or two after the ordinance was passed, and that he did not sign the record until after he went out of office.

Counsel is mistaken in his assumption that the signature of the mayor to the ordinance is essential to its legal enactment, or that the signature of that officer to the record is essential to its proof. The mayor of a city has authority under the statute (Crawford & Moses' Digest, § 7701) to veto an ordinance, but there is nothing in the statute requiring him to approve it or sign it before it becomes effective. The statute quoted above merely provides for a method of making a record of ordinances of a city or town similar to the record of enrolled bills enacted by the Legislature and deposited with the Secretary of State. The signature of the presiding officer of the council is merely for the purpose of making a record, but the failure to sign this does not defeat an ordinance which has been duly passed.

Another section of the statute (Crawford & Moses' Digest, § 7497) provides what shall constitute proper proof of by-laws and ordinances of a city council. The provision is that printed copies of such by-laws and ordinances published under authority, and transcripts of such by-laws or ordinances recorded in any book or entered on the minutes or journal ''kept under the direction

of such municipal corporation, and certified by its clerk, shall be received in evidence for any purpose,'' etc. In the present case there was introduced a certified transcript from the record showing the recorded ordinances as passed by the city council. This is sufficient evidence to establish the legal enactment of the ordinance, and its effect is not defeated by showing that the record had not been signed by the mayor while he was acting as such. The record of the ordinances is kept in the hands of the city clerk, together with the journals showing the progress of the ordinances through the council, and where these records, taken together, show a valid ordinance, they cannot be attacked by parol evidence. *Roberts* v. *Street Improvemnt Dist. No. 2 of Morrilton, ante* p. 248.

It is also contended that the record of the ordinance is invalid because, instead of actually transcribing it on the record, the pages containing the copy were pasted into the record. This was sufficient compliance with the statute. *Carrier* v. *Comstock*, 108 Ark. 515.

Some of the members of the city council signed the petition for the construction of the improvement, and it is contended that this disqualified them from joining in the action of the council in passing the ordinance pursuant to the petition.

The city council, in passing on the petition and enacting the ordinance, acts in a legislative capacity, and personal interest does not disqualify the members of the council. We think that there is nothing in the contention that the fact that some of the members of the council signed the petition rendered the action of the council invalid.

Section 9 of the statute creating the district provides a limitation in the expenditures ''for the extension, repair and reconstruction of said water, light and sewer plants to thirty per cent. of the assessed value of the real property within the district, as shown by the last county assessment, but said thirty per cent. shall not include the interest on money borrowed, nor debts of the

city of Forrest City or its water and light department heretofore incurred, nor the debts now existing against said'' former districts. The original petition for the' creation of the district did not express a limitation on the cost, but merely asked for the creation of the district in accordance with the statute. It was not essential to the validity of the proceedings that there should be any limitation expressed in the petition, for the petition followed the law and carried with it any limitations expressed in the law.

The second petition was identical in language with the original petition, so far as the purpose of the organization was concerned, but it contained the following clause with respect to limiting the cost of the improvement:

"We further petition and pray that the cost of such improvements so undertaken be assessed and charged upon the real property situated within said district, the total cost of·the undertaking herein, exclusive of interest, not to exceed the sum of $115,000."

This limitation upon the cost of the improvement certainly did not constitute a variance from the original petition so as to avoid the proceedings. It is not necessary to limit costs of an improvement in the petition signed by owners of the property asking for the improvement, but the fact that the property owners do express such a restriction in the petition does not avoid the proceedings. It is unnecessary to discuss the full effect of the limitation expressed in the petition, for the only question we are called on to decide now is whether the inclusion of that expression constitutes a departure from the purposes expressed in the original petition, and whether it affects the validity of the proceeding, and we.hold that it does not constitute such a departure, and does not affect the validity.

The final contention·is that the second petition does not.contain the signatures of the owners of a majority in value of the real property in the district.

Appellants introduced proof in an effort to show that many of the signatures to the petition were unauthorized, and that some of the persons who signed did not own any real property in the district. During the progress of the trial the parties on each side obtained the consent of the court for three persons who were familiar with the property in the locality and the persons signing the petition, as well as the ownership of the various pieces of property, to check over the list, in an effort to agree upon the question as to the valuation of the property of those who had properly signed the petition, so as to eliminate controversy in open court and reduce the controversy to a determination of the questions about which there were irreconcilable differences of opinion. Upon the report of these persons, after examining the list carefully, it was conceded that the value of the property owned by the persons and corporations whose names appeared signed to the petition amounted to $536,000, in round numbers, and that the total valuation of the real property in the district was found to be $1,014,000 in round numbers. So, in order to constitute a majority, there must be found the signatures of owners of property in excess of $507,000.

It appears from an examination of the petition that local business corporations, the names of which were signed to the petition, owned property set opposite the respective names of each corporation in the following list:

| | |
|---|---:|
| Forrest City Grocer Co. | $14,000 |
| Fussell-Graham-Alderson Co. | 2,150 |
| The Vaccaro-Grobmyer Co. | 2,620 |
| The Merchants Grocer Co. | 2,000 |
| Forrest City Compress Co. | 2,000 |
| Forrest City Box Co. | 2,400 |
| The Planters' Bank & Trust Co. | 4,250 |
| The Forrest City Gin Co. | 2,600 |
| The Bank of Eastern Arkansas | 3,000 |
| The B. P. O. E. Lodge No. 1219 | 3,000 |
| The First Nat'l Bank of Forrest City | 3,500 |
| Making a total of | $41,520 |

Appellants contended below, and contend now, that, according to the evidence adduced, persons who signed the names of these corporations had no legal authority to do so, and that the names should be stricken from the petition, and that the property owned by these corporations should not be counted in making up the majority. It is thus seen that if the contention of appellants is sound and the total valuation of the property owned by the corporation be stricken from the list, it leaves the petition about $12,000 short of the requisite amount to constitute a majority.

The proof shows that all the other signatures necessary to make up the amount of approximately $495,000 were authorized, and were properly signed to the petition.

It is unnecessary to discuss the circumstances under which the names of all these corporations were signed, but we will discuss a sufficient number of the items to be determinative of the present controversy.

The largest corporation property owner is the Forrest City Grocer Company, with a valuation on its real property of $14,000. This is a corporation carrying on a merchandise business in the city of Forrest City, and Mr. A. B. Nimocks, who signed the name of the corporation to the petition, is the president and manager and principal stockholder. There are seven directors, all living in Forrest City except one, who resides in a town a few miles distant. Mr. Nimocks testified that he talked to a majority of the directors, and they approved it. He testified further that he had the management of the general affairs of the corporation and attended to all of its business, including the assessment of property for taxes. He testified that he usually signed all necessary papers concerning the business and property of the corporation, without obtaining express authority from the other directors. He stated that he did not remember that he had ever had occasion to sign a petition for an improvement before this one. There was no formal meeting of the

board of directors for the purpose of authorizing Nim-
ocks to sign the petition, nor was there any such formal
meeting held until during the progress of the trial in
the chancery court.   During a suspension of the trial
this corporation, as well as all the others whose signa-
tures appeared on the petition, held directors' meetings,
and formal resolutions were passed ratifying the ac-
tion of the respective officers who had signed their names.
Counsel for appellee insist that that was a timely rati-
fication in each instance, but this court reaches the con-
clusion that it was too late to validate the signatures by
ratification after the enactment of the ordinance, for
the reason that there must be a majority in value of the
property represented by authorized signatures before the
council can pass the ordinance.

We are of the opinion that the evidence is sufficient
to show that the signing of the petition was within the
scope of the general authority which the directors, by
continued custom, permitted the person who signed the
petition to exercise, and that the corporation as well as
all others are bound by his act.   It appears from Nim-
ocks' testimony that he had exclusive management of
the affairs of the corporation and was permitted to ex-
ercise full authority to do anything which, in his judg-
ment, called for action for the benefit of the corporation.
In other words, there was a course of conduct permitted
on his part which amounted to holding him out as the
corporation itself, and under these circumstances we
think that the corporation is bound.   *Estes* v. *German
Natl. Bank,* 62 Ark. 7; *Stiewel* v. *Webb Press Co.,* 79 Ark.
45; *Winer* v. *Bank of Blytheville,* 89 Ark. 435; *Wales-
Riggs Plantations* v. *Caston,* 105 Ark. 641; *C. L. Kraft
Co.* v. *Grubbs,* 116 Ark. 520.

This court, in dealing with this subject in the case
of *Estes* v. *German National Bank, supra,* speaking of the
authority of the board of directors, said:

"They can do so by permitting the directors to es-
tablish a habit or usage of assenting separately to the

making and performance of contracts by their agents. By permitting such usages or habits to be formed by a long course of business, they adopt and become bound by them, so long as they acquiesce. If this were not so, great injustice might be done to parties contracting with them in their usual way.''

In *Winer* v. *Bank of Blytheville, supra,* we said: ''The rules governing the authority of an agent to act for a private business corporation, and the proof thereof, are in many regards the same as between agents of natural persons. The authority of an officer to act for a corporation may be established by proof that he was held out to the public as possessing those powers which he exercised in a given case, or that the corporation has acquiesced in or ratified such acts.''

Applying this rule to the present case, we think it is clear that Mr. Nimocks had authority to bind the corporation. The appearance of the signature on the petition raised the presumption that it was placed there by authority. *Malvern* v. *Nunn*, 127 Ark. 418; *Walton* v. *Light Improvement Dist.*, 144 Ark. 249.

There is also a presumption that the proposed improvement will result in benefit to all the real property in the district, and the evidence shows that Mr. Nimocks was authorized to act for the corporation in all matters in which it was interested or from which it could receive benefit. The addition of the property of this corporation to the amount of other property which is represented on the petition by authorized signatures runs the valuation up to an amount about $2,000 in excess of a majority of the property in the district, but there are several other corporations in precisely the same attitude with respect to the manner in which their signatures were attached. For instance, the signature of the Fussell-Graham-Alderson Company was signed by Mr. Alderson, who testified as a witness in the case, and stated that he was the vice-president and the manager of the business, that he had authority from the directors to

handle any business matter which came up with reference to the property and affairs of the corporation. Mr. James Fussell was the president, and expressly consented to the signing of the petition, as did the other directors, except one who was sick at the time and could not be consulted. He testified that it had been his custom to sign deeds without any special authority from the board. The testimony of Mr. Alderson was sufficient, we think, to show that he was permitted to pursue a course of conduct with respect to the affairs of the corporation which fairly implied the authority to do anything which affected the interests of the corporation in regard to its property and affairs.

The name of the Vaccaro-Grobmyer Company was signed by Mr. Grobmyer, who was the active manager of the business. He testified that there were three stockholders and directors—himself, Mrs. Pearl Vaccaro, and Gazzola Vaccaro, and that the business was under the active control of himself and Gazzola Vaccaro; that the latter expressly approved his signing the petition, but that Mrs. Vaccaro was not consulted, as she was absent at the time the matter came up. The testimony of the witness shows that this corporation, in which only three persons were interested as stockholders and directors, was under the active management of two of them, who did whatever was necessary to further the interests of the corporation in regard to its property and affairs, and that these two participated in signing the petition. We think that, under the rule already announced, there is abundant testimony to show that there was authority on the part of Grobmyer to sign the petition.

This carries the amount of valuation represented by the signatures on the petition considerably above a bare majority, and it is unnecessary to discuss the circumstances under which the names of the other corporations were signed. It may be said, however, in passing, that in most, if not in all, instances, the evidence was sufficient to establish authority for the signatures of the

names of the other corporations. It follows that the court was correct in finding that there was a majority in value shown on the petition.

The decree is therefore affirmed.

WOOD and HART, JJ., dissent.