## MAHAN *v.* WILSON.

## Opinion delivered June 29, 1925.

1. COURTS—JURISDICTION—COUNTY HAVING TWO DISTRICTS.—Under Acts 1919, No. 468, creating the Chickasawba District of Mississippi County, which confers upon the courts of that district jurisdiction over persons and property resident and being therein "the same and in like manner as if said district was a constitutional county," *held* that the jurisdiction of the courts in the Chickasawba District extends exclusively over lands situated wholly within the district and over parties of a controversy all of whom reside in the district; all other jurisdiction remaining in the Osceola District of Mississippi County.

2. DRAINS—JURISDICTION TO CREATE DISTRICT.—The jurisdiction of the county court of the Osceola District of Mississippi County to hear and determine a petition for the organization of a drainage district under Acts 1901, No. 81, was not taken away by Acts 1919, No. 468, though part of the affected area was situated in the Chickasawba District.

3. DRAINS—SUFFICIENCY OF PETITION.—Under Crawford & Moses' Dig., § 3608, where a petition for the creation of a drainage district or subdistrict is signed by a majority of the property owners, the county court, without a finding as to their interests in such property, may make an order creating the district.

4. DRAINS—NOTICE OF HEARING OF PETITION.—Under § 3607, Crawford & Moses' Dig., § 3607, requiring the county clerk to give notice by publication to all persons owning property within a drainage district to appear before the court to show cause for or against the establishment of the district, it is implied that a description of the property to be embraced shall be contained in such notice.

5. DRAINS—PROOF OF PUBLICATION OF THE NOTICE OF HEARING.—Crawford & Moses' Dig, §., 6807, does not make the affidavit of the editor, proprietor, manager or chief accountant of a newspaper the sole or exclusive evidence of the publication of the notice of the hearing of a petition to organize a drainage subdistrict.

6. DRAINS—DESCRIPTION IN PUBLISHED NOTICE.—The published notice of the hearing of a petition to organize a drainage subdistrict should follow the description of the property of the district as found in the report of the commissioners, which is the basis of the court's action in determining whether the district should be created.

7. APPEAL AND ERROR—PRESUMPTION FROM SILENCE OF RECORD.—Where the transcript on appeal from an order creating a drain-

age subdistrict fails to include a map referred to in the report of the commissioners, it will be presumed on appeal that the trial court found that there was no discrepancy between the published notice and the commissioners' report in describing the territory embraced in the subdistrict.

8.  DRAINS—RIGHT OF SIGNERS TO WITHDRAW FROM PETITION.—After a petition for organization of a drainage subdistrict has been filed, signers thereof cannot withdraw their names, except for cause.

9.  DRAINS—EFFECT OF FILING PETITION.—The filing of a petition for establishment of a drainage district or subdistrict is in the nature of an election, and, if the requirements of the statute are complied with, and the petition contains the names of a majority of the landowners, either in number, acreage or value, the statute makes it the duty of the court to create the district.

10.  DRAINS—CONTEST—BURDEN OF PROOF.—The burden of proof is on those who contest a petition of property owners for organization of a drainage subdistrict to show that names appearing thereon were not signed by authority.

11.  DRAINS—CONDITIONAL SIGNATURES.—Where a group of persons signing a petition for the organization of a drainage subdistrict did so on condition that their names were to be withheld unless a certain commissioner should resign, and their names were left on the petition though the commissioner did not resign, such signatures are valid where they did not appear and ask that their names be withdrawn.

12.  DRAINS—RATIFICATION TO SIGNATURE TO PETITION.—Where proceedings for the organization of a drainage subdistrict were still in progress in the circuit court, it was not too late for a corporation whose signature was challenged to ratify its signature.

13.  DRAINS—OMISSION OF BENEFITED LANDS.—The fact that lands in two adjacent drainage subdistricts, which will be benefited by the organization of the subdistrict in question, were omitted therefrom does not invalidate the latter subdistrict, since the former subdistricts may be required to pay for such benefits.

14.  DRAINS—SIZE OF SUBDISTRICT.—That a drainage subdistrict in area comprises nearly the whole of the original drainage district, and the cost of the contemplated improvement is greater in extent than that of the original district does not render it invalid; there being no limitation on the size or cost of the subdistrict in Crawford & Moses' Dig., § 3650.

Appeal from Mississippi Circuit Court, Osceola District; *W. W. Bandy*, Judge; affirmed.

*Sam Costen* and *Little, Buck & Lasley,* for appellant.

*J. T. Coston,* for appellee.

McCULLOCH, C. J. Grassy Lake & Tyronza Drainage District No. 9 of Mississippi County, created by an order of the county court in May, 1911, pursuant to the general statutes (Crawford & Moses' Digest, § 3607 *et seq.*), providing for what is commonly termed the "alternative system of drainage districts," covers territory in Mississippi County about forty miles long, of an average width of about seven miles, and it reaches from the northeast corner of the county to within a few miles of the southwest corner. The principal ditches of the district begin at the foot of Clear Creek, a few miles southeast of Blytheville, and follow the general course of the Tyronza Basin, which runs from the northeast to the southwest, parallel with Little River. Since the completion of the ditches in the district according to the plans of the improvement, numerous owners of real property within the boundaries of the district filed their petition in the county court of Mississippi County praying for the formation of a subdistrict, to be composed of certain lands wholly within the original district, for the purpose of adding additional improvements in the way of new ditches and widening and extending the main ditch as an outlet. The petition filed with the county court gave a description of the lands sought to be embraced in the subdistrict, and the county court entered an order directing the commissioners of District No. 9 to "cause a survey to be made to ascertain the limits of the region which would be benefited by the proposed system of improvement." The commissioners of the original district complied with the order of the county court by employing an engineer and causing a survey to be made, and the commissioners made a report, accompanied by a map, showing plans for the additional improvement and a description of the area which would be benefited thereby. This report was filed with the county court on December 1, 1924, and

the court ordered publication of notice and set the date for hearing on December 23, 1924. On November 15, 1924, there was filed with the county court a petition of owners of property in the proposed subdistrict, claiming to be a majority thereof in acreage, and praying for an order of the county court creating the subdistrict. Certain other owners of real property in the district filed a remonstrance, and there was a hearing by the court on the day set for the hearing (December 23, 1924), and the court granted the prayer of the petitioners and created the proposed subdistrict, to be designated as Subdistrict No. 3 of Grassy Lake and Tyronza Drainage District No. 9 of Mississippi County. The remonstrants prayed an appeal to the circuit court of Mississippi County, where there was a hearing on January 17, 1925, which resulted in a judgment of the circuit court affirming the order of the county court creating the subdistrict in accordance with the prayer of the petition therefor, and an appeal has been duly prosecuted to this court.

There are two court districts in Mississippi County, where terms of all the courts—circuit, chancery, county and probate—are held. One of the districts is designated as the Osceola District, wherein the courts are held at Osceola, the county seat, and the other district is designated as the Chickasawba District, and the courts are held at Blytheville.

The act originally creating the court district was enacted in the year 1901 (Acts 1901, p. 136) and merely provided for the holding of circuit, chancery and probate courts in Chickasawba District, but a statute enacted in 1919 (Act No. 468), amending the original statute, provided for holding sessions of the county court in Chickasawba District, and this statute reads as follows:

"That all matters of county and probate jurisdiction pertaining to that part of Mississippi County within the Chickasawba District and to persons and property resident and being therein shall be subject to the jurisdiction and examination of the county and probate court

of the County of Mississippi for the Chickasawba District, the same and in like manner as if said district was a constitutional county of the State of Arkansas."

The area covered by the subdistrict which was organized by order of the county court lies partly in the Osceola District and partly in the Blytheville District, and these proceedings for the formation of the subdistrict were instituted and progressed to final judgment in the county court sitting at Osceola.

The first contention of counsel for appellants in their assault upon the validity of the organization is that the county court was without jurisdiction for the reason that a part of the lands involved are situated in the Chickasawba District. Counsel rely on the language of the statute quoted above conferring jurisdiction of the county court within the Chickasawba District over "persons and property resident and being therein," and also that part of the statute which declares that the Chickasawba District shall exercise jurisdiction "the same and in like manner as if said district was a constitutional county." This contention is, we think, unsound. In the recent case of *Bonner* v. *Jackson,* 158 Ark. 526, we held that the statute providing for separate terms of the county court in each of the court districts of the county did not destroy the constitutional unity of the county and was valid. The partition and allotment to the respective county courts to be held in the two districts, of the constitutional jurisdiction of the county court over the local concerns of the county is purely statutory and does not, as we held in the case cited above, in anywise offend against the Constitution. It must be assumed that the framers of the statute did not attempt either to take away from the county court any of its constitutional jurisdiction over its local concerns, and confer it upon the circuit court, nor that there was any intention to entirely exclude the exercise of jurisdiction by one or the other of the county courts authorized to sit in the county, merely because the sub-

ject-matter of the exercise of jurisdiction was situated partly in one of the court districts and partly in the other. It is our duty to give the statute a reasonable interpretation, so as to confine its operation within constitutional limits, and in approaching the interpretation in that spirit it is evident that the language of the statute tmeans that the jurisdiction of the courts in the Chickasawba District entends exclusively over lands situated wholly within the district and over persons to a controversy all of whom reside in the district. All other jurisdiction remains in Osceola court. This view is in entire accord with prior decisions of our court (*Pryor* v. *Murphy*, 80 Ark. 150; *Murrell* v. *Exchange Bank*, 168 Ark. 465, and we therefore hold that the jurisdiction of the Osceola District was not defeated because part of the area involved was situated in the Chickasawba District.

It is next contended that the creation of the subdistrict was erroneous for the reason that there was no proof of the publication of the notice required by statute, and that the notice was insufficient in that it failed to give a description of all of the property to be affected by the organization of the district, and omitted some of the lands described in the original petition. Subdistricts are authorized by statute to be organized and added to original districts on petition of "three or more owners of real property within a proposed subdistrict, composed of land wholly within a drainage district, or partly within and partly without such district." Crawford & Moses' Digest, § 3650.

Under the statute the organization of original districts and of subdistricts is made in the same manner and by the same procedure, which is, in brief, as follows: When three or more owners of property file a petition with the county court asking for the organization of a district or subdistrict, the petition "describing generally the region which it is intended shall be embraced," the county court enters an order appointing an engineer to make a survey or requiring, in the case

of subdistricts, the commissioners of the original district to cause a survey to be made. A bond to pay the expenses is required of the petitioners. The statute provides that the engineer "shall forthwith proceed to make a survey and ascertain the limits of the region which would be benefited by the proposed system of drainage; and such engineer shall file with the county clerk a report showing the territory which will be benefited by the proposed improvement, and giving a general idea of its character and expense, and making such suggestions as to the size of the drainage ditches and their location as he may deem advisable." Crawford & Moses' Digest, § 3607. The section with reference to subdistricts provides that the commissioners shall "forthwith proceed to cause a survey to be made and to ascertain the limits of the region which would be benefited by the proposed system of improvements, and the commissioners shall cause a survey to be made, and shall file with the county clerk a report showing the territory which will be benefited by the proposed improvement, and giving a general idea of its character and expense and making such suggestions as to the size of the drainage ditches and their location as the commissioners may deem advisable, and shall file their report with the county clerk." Crawford & Moses' Digest, § 3650.

It is further provided in the statute with reference to both original districts and subdistricts that upon the filing of the report the county clerk shall give notice by publication in weekly newspapers of the hearing before the county court. It is then provided that on the day of the hearing if it is found to be to the best interests of the owners of real property in the district that the same shall become a drainage district, or a subdistrict, as the case may be, the court shall make an order establishing the district or subdistrict. If a petition or petitions be presented to the county court, signed by a majority "either in numbers or in acreage or in value of the holders of real property within the proposed district, praying that the improvements be made, it shall be the

duty of the county court to make the order establishing the district without further inquiry." It is thus seen that the county court is empowered, upon the original petition of three or more property owners, to create a drainage district or subdistrict, if it is found to be "to the best interests of the owners of real property within said district that the same shall become a drainage district," and that, if there is a petition by a majority of the property owners, then it is the duty of the court, without any finding as to the interests of the parties, to make an order creating the district. *Jones* v. *Fletcher,* 132 Ark. 328. It is further seen that the statute does not expressly provide that the published notice shall contain a description of the property to be embraced in the district, but, if the notice is to be made effectual, it is necessarily implied that, in order to apprise the property owners of the proceedings affecting their interests, the description of the property should be contained in the notice. The sufficiency of proof of publication is challenged on the ground that there was no affidavit filed by the "editor, proprietor, manager or chief accountant," as provided by statute. Crawford & Moses' Digest, § 6808. The answer to this contention is that the statute does not make the affidavit the sole or exclusive evidence of publication. *Whitford* v. *Whitford,* 100 Ark. 63; *Allen* v. *Allen,* 126 Ark. 164. There was other evidence legally sufficient to establish the fact that the publication of notice had in fact been made in the manner prescribed by statute. It is also contended that the notice was insufficient because the description of the property did not coincide with the description in the original petition in that certain tracts contained in the original petition were omitted. We assume that counsel in their argument are referring, not to the initial petition of three or more property owners, but to the last petition which was filed and which prayed for the formation of the district in accordance with the report of the engineers. Indulging the presumption that the lawmakers intended to require a

description of the property in the notice, it necessarily follows that description should be in accordance with the report of the engineers in the case of an original district, or with the report of the commissioners in the case of the creation of a subdistrict, for the report is the thing which forms the basis of the court's action in determining whether or not the district or subdistrict should be created. Crawford & Moses' Digest, § 3650. Counsel fail to satisfactorily make it appear to us from the record that there is a variance between the description in the notice and that contained in the report of the commissioners. They refer to a map in the record, but the map to which they refer has not been made a part of the report, but was merely introduced in evidence, and we do not discover any discrepancy between the description in the notice, and that in the map which was filed with the report. These maps were before the trial court, who examined them and heard the evidence with reference thereto, and we do not feel at liberty to disturb the finding of the trial court that there is no discrepancy in the notice and the report. We must indulge the presumption that the court found that there was no such discrepancy.

The next assault upon the correctness of the judgment is that the petition praying for the creation of the district did not contain a majority in acreage of the owners of property. This general charge of insufficiency of the petition embraces in detail the contention that many of the names of persons and corporations were signed without authority, and that many of those who originally signed the petition should have been accorded the privilege of withdrawing their names before the petition was acted on and before the order creating the district was made by the county court. The district as created by the county court contained 171,680.07 acres, and it was therefore necessary in order to constitute a majority that the petition should be signed by the owners of land in excess of 85,840.04 acres. There were many of the petitions grouped together and filed, and all of

them contained the names of individual and corporation owners of land of the aggregate acreage of 95,543.04, which constituted a majority of 7703 acres. After the petition was filed, but before the hearing by the county court, persons owning land of the aggregate acreage of 5386 acres filed a remonstrance asking that their names be withdrawn from the petition. It was a bare request for withdrawal without stating any grounds. Subsequently four of the same persons, owning 1070 acres, resigned the original petition and the court refused to allow any of the parties to withdraw their names after the petition was filed. It is contended that this was error. We decided in the recent case of *O'Brien* v. *Root*, 167 Ark. 119, which involved petitions for the formation of a stock district, that signers could not withdraw their names, except for cause, after the filing of the petition. This was in accord with our prior decisions holding to the same effect with reference to petitions under the prohibition law. *Bordwell* v. *Dills*, 70 Ark. 175; *Colvin* v. *Finch*, 75 Ark. 154. Counsel argue that these cases have no application for the reason that under the statutes involved in those decisions the jurisdiction of the court depended upon the filing of petitions, whereas in the present case the jurisdiction does not so depend. We are of the opinion that this is not a sound distinction, for the jurisdiction or authority of the court to create the district without finding it to be to the best interests of the parties depends upon the petition of a majority of landowners, and the same reasons which required a prohibition petition or a petition for the creation of a stock law, apply to the drainage statute, which provides for a petition of a majority of the property owners. The filing of a petition is in the nature of an election, and, if the requirements of the statute are complied with, and the petition is found to contain the names of a majority of landowners, either in numbers or in acreage or in value, the statute makes it the duty of the court to create the district. *Jones* v. *Fletcher, supra.* There is no attempt to show in the present case any grounds

for permitting the withdrawal of names for cause. The authenticity of the names on the petition was challenged in many instances, and it is contended that the burden of proof rested upon those who presented the petition. We have held to the contrary, and said that the burden of proof is upon those who contest the petition of property owners to show that the names appearing thereon were not signed by authority. *Board of Improvement* v. *Offenhauser,* 84 Ark. 257; *Malvern* v. *Nunn,* 127 Ark. 418; *Walton* v. *Light Improvement District,* 144 Ark. 249; *Lewis* v. *Forrest City Special Imp. Dist.,* 156 Ark. 356. It is argued that, as those decisions related to municipal improvement districts in suits questioning the validity of the signatures after they had been accepted by the city council, the question of their authenticity was not raised in an original proceeding such as the present one. Counsel mistake the effect of those decisions, for they were rendered in chancery cases, which, under the statute, constituted an original review and a direct proceeding challenging the sufficiency of the petition for the improvement. We see no reason why the same rule should not apply in a case like the present one. The signatures are presented with apparent authority, and, if they are questioned, the burden of proof rests upon the person challenging the authority. The petitioners are in the attitude of being represented in court by those who present the petition to the court, and if there is any lack of authority it should be shown by those persons who contest it. This rule applies to signatures of corporations as well as individuals, if the signatures are made by those who have the apparent authority under the laws of the State to sign for the corporation. *Lewis* v. *Forrest City Special Imp. Dist., supra.*

There is the name of one corporation on the petition, the Chicago Mill & Lumber Company, which signed for about 4000 acres of land, and the signature does not appear to have been made by one in authority, but that name may be eliminated, and the whole acreage repre-

sented as owned by that corporation may be deducted without reducing the amount of acreage on the petition below a majority.

Proof was offered to the effect that a group of persons who signed the petition held a meeting and gave written directions to Mr. Wilson, one of the parties who circulated the petition, to withhold their names unless the commissioners of the main district should resign. The commissioners did not resign, and the names were not withdrawn, but Wilson testified that he was instructed to file the petition. But, even if this were not true, it does not appear that any of the individuals of the group who imposed this condition ever appeared in court and asked that their names be withdrawn. If they had appeared and shown that their names were fraudulently left on the petition in disregard of their instructions, it would have afforded sufficient cause to permit the names to be withdrawn. These persons made no objections to the signatures, and are apparently in accord with the others who approved the project of forming the subdistrict.

There is also involved the question of ratification of the signature by one of the corporations after the case reached the circuit court. Counsel for appellant contend that it was too late, and they rely upon the decision of this court in the case of *Lewis* v. *Forrest City Special Imp. Dist., supra.* That case, however, involved a municipal improvement where the ratification occurred after the ordinance providing for the improvement had been enacted and published and after the proceedings had passed out of the hands of the city council, and we held that it was too late to ratify after the litigation arose. In the present instance the proceedings were still in progress in the circuit court, and it was not too late for the challenged signature of the corporation to be ratified by the proper officers.

Our decision upon this branch of the case is that it was established that the petition was signed by a majority in acreage of the property in the district.

It is next contended that the judgment should not be sustained for the reason that the subdistrict as created omitted a large body of land which will be benefited by the improvement. It appears that, since the organization of the original District No. 9, two other districts have been organized covering a large area—one being District No. 12 and the other District No. 8. The waters in these districts are emptied into the principal carrying ditch of District No. 9, and it is shown that there is an agreement between District No. 9 and the two districts mentioned above that a price is to be paid for the right to flow the waters from those districts through the ditches of original District No. 9. The contention is that, as these two districts are contiguous to original District No. 9 and to the subdistrict created by this proceeding, the lands will be necessarily benefited and should have been added to the improvement or that the subdistrict should not have been created without the inclusion of those lands. In the case of *Sanders v. Wilmans,* 160 Ark. 133, we held that, under a certain special road act which created a district and provided for the annexation of benefited land by order of the county court, it was erroneous to annex land upon a showing that other lands not embraced in the annexation were benefited. The doctrine in that case does not, however, apply in the present case for the reason that, while there was a showing that the lands in Districts Nos. 8 and 12 will be benefited by the flow of water through the ditches of the original District No. 9, which are to be enlarged by this subdistrict, all of the benefits thus obtained are to be provided through the agency of those two organizations, and the right to flow the water through the ditches of District No. 9 is to be paid for. Notwithstanding the omission of these lands from the district, if the benefits are to be paid for through other agencies as before stated, assessments cannot be made by a contiguous district to cover the cost of the same improvement, but there is a statute which provides that if an adjoining district shall drain its waters into a

ditch belonging to another district, the commissioners of the latter shall have authority to assess the benefits and levy taxes to pay for same. The fact that the lands in those two districts were omitted from this organization does not affect the validity of the organization. Those lands can be taxed for any additional benefit accruing by reason of the new improvement.

It is finally contended that the district is not really a subdistrict under the statute, and the argument is that this is so because the magnitude of the district in area and in cost of the improvement is out of proportion to the original district and the extent of the old improvement. It is a fact that the area of the subdistrict comprises nearly the whole of the original district, and the cost of the improvement contemplated by the subdistrict is greater in extent and more expensive than that of the original district. The only limitation expressed in the statute with regard to a subdistrict is that it must be formed of lands "wholly within a drainage district or partly within or partly without such district." Crawford & Moses' Digest, § 3650. It cannot be composed of lands wholly outside of the district. The statute says nothing about the extent of the area, the magnitude of the improvement or the cost thereof, but it is necessarily implied that the improvement contemplated by the subdistrict must be such that it can be treated as part of the same unit as the improvement provided for in the original district and not an independent improvement. In other words, this branch of the case turns on the question of the unity of the two projects—the original improvement and the new addition thereto—rather than on the extent and magnitude of the new project in comparison with that of the original one. If there is such unity that the two projects could have been originally joined together as one improvement, then we see no reason why under the statute the last one cannot be joined as a subdistrict notwithstanding its magnitude and extent. The manifest purpose of the statute authorizing the creation of subdistricts was to permit owners

of land situated wholly in the original district or partly in and partly out of the district which would have been benefited by the original improvement but which would receive additional benefit from an added improvement, to join the new improvement to the original as one project. On the other hand, if the new improvement is wholly independent, it cannot be joined to the original one merely because the lands in the proposed subdistrict are situated wholly within or partly within and partly without the original district. Now, testing the project under investigation, we see no reason why it cannot be treated as a part of the original project because of its comparative magnitude. It is an additional drainage scheme which will furnish additional drainage by the enlargement and extension of the original plans. The statute does not authorize the changing of original plans by the original district itself after the completion of the improvement (*Indian Bayou Drainage District* v. *Walt,* 154 Ark. 335), but it does authorize the organization of a subdistrict for that purpose. Of course, the same result may just as easily have been accomplished by providing for the creation of a new and independent district, rather than join it onto the old district, but the lawmakers have authorized the organization of such a district, and we have nothing to do with the policy which prompted this provision of the law. We can only take cognizance of it and enforce the provision when the facts justify.

We are unable to discover any grounds upon which we would be justified in holding that the organization of this district should be denied on any grounds recognized by the statute, either expressly or by fair implication. That being true, it remains only to say that the judgment must be affirmed, and it is so ordered.

WOOD and HART, JJ. dissent.